This case was dismissed at the pleading stage, at the 12B6 stage, only because the district court improperly resolved disputed facts against the plaintiffs by misreading and interpreting body camera video that does not blatantly contradict the allegations in the complaint. The court should reverse the remand because those videos upon which the court relied do not blatantly contradict the allegations. Under the clearly established law, especially the Partridge case, deadly force was unconstitutional under these facts and the remaining claims, aside from the 1983 claims, rise and fall based upon that same error. In other words, everything, all the other rulings the court made on the other counts are derivative of its central finding that the facts or the videos blatantly contradict the facts of the complaint. Counsel, this is a multifaceted case, but it seems to me that the video does conclusively show at least some things. It shows that Holland comes out from hiding, he faces the officers, he starts to lower the gun from his temple and simultaneously starts to raise his left hand in the general direction of the firearm. Why is that not a menacing act? Judge, this was very similar to the Partridge cases, the Partridge 1 and Partridge 2, which the first one was decided on 12B6, the second one was decided on summary judgment. Plaintiffs contend that at no time in this entire scenario did George Holland point his gun at or in the direction of any of the officers. Is that required? To take menacing action is what is required. Right. Well, in the case I think that Judge Graz and I were on, that Mazer, I believe, I may be getting the name wrong, but didn't we say that pointing the gun at the officers was not required? Well, menacing action, but that also – But we distinguish pointing the gun from menacing action. In other words, that menacing action is broader than pointing the gun. It could be broader than pointing the gun, but under that line of cases, Mazer and Aden, I believe, those cases both involved undisputed advancing towards the officers. And I think even in one of those cases, as the gentleman was raising the gun in the officer's direction, he fired the gun, fired it into the ground. Certainly, that's not what we have here. We have a 15-minute episode where a man going through a suicidal crisis is in a building by himself, staying 35 feet away from the officers, only threatening self-harm, never pointing the gun at the officers. And there was a crisis counselor en route. There was an ongoing dialogue with Mr. Holland the entire time. He even offered to give up his gun if he could just talk to a priest or the news. Instead of waiting – and all the officers were on the outside of the building behind a brick-and-stone barricaded wall in a tactically concealed covered position. There were 10 officers, and that was the only egress from this building. So I interrupted you answering Judge Graza's question, but the facts Judge Graza described, I think I interrupted your answer, too. But why isn't that menacing? I take your answer to be that in the broader context, that it wasn't. In other words, the facts you're just describing render those movements to be non-menacing? Because I believe that that becomes a factual question for a jury. I believe at worst – number one, we believe the video doesn't show any menacing action. But at worst, it's ambiguous as to his movements. Well, isn't the objective officer standard a question of law, though? Well, they have to objectively and reasonably believe that there's imminent threat. In other words, the menacing action, isn't that a legal question? At least when we have a video showing the conduct that's at issue, the facts at issue. Only if it blatantly contradicts the complaint, which the video does not do here. According to the complaint, he was taking no menacing actions, making no threats to the officer. That's a legal assertion, right? Again, the menacing action is that, or my misunderstanding, isn't that a legal question? It would have to be factually backed up, though, and I think that's part of our argument, is the facts on this video are at best, or at worst, ambiguous. And there is nothing in there that blatantly contradicts the allegations in the complaint. And if they do not blatantly contradict the allegations in the complaint, then the plaintiff is entitled to all reasonable inferences. And you'll notice, too, that the district court, as well as defendants, in the district court's order and in their brief, they say, well, the defendant appeared to be getting into a shooting stance. Appeared, an appearance is not a fact, it's not a blatant contradiction. What it is, is an inference. And it's an inference that the district court was not allowed to make on a 12B6 motion. If the defendants believe that is true, then they have the opportunity to prove that on summary judgment. But, again, at best, the movement of the gun in this scenario is, we believe, benign. But, at worst, it's ambiguous. And if it's ambiguous, then the plaintiff is entitled to all reasonable inferences on a 12B6 motion. Would you agree, though, counsel, that the officer doesn't have to wait until Mr. Holland actually fires the weapon to feel threatened? Certainly. Absolutely. And the Constitution provides for that protection. And that's why there has to be an objectively, an objective, imminent threat is the standard you have to look at there. Whether he's lowering the gun here or, you know, and, again, the district court said that he extended his right arm with the gun out. I've watched that video over 100 times, frame by frame. It doesn't happen. It has to be an objective, imminent threat. But, again, the video doesn't even come into play unless it blatantly contradicts the allegations in the complaint. And there is no evidence on that video that blatantly contradicts the allegations in the complaint. That's the only way the video ever gets in. And, again, we think the video supports our case. Does it? What relevance is the location of the various officers outside? As I understand, this is a single, this is a room, it's a little hard to tell from the video, but it's a concrete room, one doorway. What is the nature of the cover, at least alleged in the complaint, that the officers can take? It's akin to being in an armored vehicle. Basically behind a stone and brick wall with the decedent has remained 35 feet at the back of the room, never advanced towards the officers. The only means of egress was through the front door, which was surrounded by around 10 officers in the concealed and covered position. There were three officers that had guns trained on this guy for at least 10 minutes, 9 minutes I believe. The only officer who felt the need to shoot was Detective Zimmerman. Sergeant Daniel Johnson, whose video, Exhibit C, is the best video of this, he did not feel the need to shoot at that time, and Officer Jordan Cliff was also there with his less lethal weapon trained on the decedent at the time and did not feel the need to shoot either. Only Officer Zimmerman felt the need to shoot. And again, what we have here is, at worst, this video is ambiguous. And if it's ambiguous, then plaintiff is entitled on a 12B6 to all reasonable inferences. Can I just ask you to clarify, what specifically is the ambiguity you're claiming in the video? Well, we believe the video is clear that the defendant, excuse me, the decedent did not ever make any motions or make any threatening actions toward the officer. He only threatened self-harm this entire time. He even told the officers, I don't want to hurt any of you. I'm going to kill myself or you're going to kill me. He never made a threat to the officers, never went to their direction, and stayed back. He didn't advance. So if we were to take my colleague's point and the district court's point on the video, that they believed he appeared to be getting into a shooting stance, again, an appearance is not a blatant contradiction. That is an inference. And we, as the plaintiffs, are entitled to all reasonable inferences at the 12B6 stage. And again, all the other claims that we're talking about here are derivative of the court's central finding there, which was the major error that we assert is that they made an improper finding of fact and improperly used the video, which does not blatantly contradict the allegations in the complaint. If there were no video here, the allegations in the claim surely would not be subject to a 12B6, or at least not a reasonable 12B6 motion. And that room had been filled with other folks, correct? Now, where are those folks at this point? Those folks have scattered back. Yeah, and there was a perimeter set up, I believe, outside. And, yeah, it was an AA meeting. And the officer, Sergeant Wiersham arrived first, and George was in there. Most of the other people, and they all knew each other. This is Sykeston, Missouri, so it's kind of a small town, so everyone knows each other. I grew up right around there. And so most of the people got out. There were two people there when I think Officer Wiersham arrived. They left without incident. So he was the only person in the room once this dialogue started with him, and they were having an ongoing dialogue. And, again, he wasn't going anywhere. He was not going to be able to get out that door. If he tried, that may have been a different legal standpoint I would be taking if he would have tried to exit that door, but he didn't. He wasn't trying to flee. He wasn't suspected of a crime. He was having a mental health crisis. He needed help at that time. Were there tables between?  Because I think the officers had to go in and go around a table, right? Yes, and you'll notice that when Detective Zimmerman went in, so he fired an initial five rounds. He then advanced in, had to push chairs aside to get around the table, fired another volley of rounds several seconds later, and then advanced further into the room and fired another volley of rounds, which brings us to another point on the video. It doesn't show the decedent when those shots were fired. So the video is not conclusive about whether those shots were even. So do we have a claim on three different sets of shootings then? So, in other words, perhaps each one should be analyzed separately for purposes of the motion to dismiss? It would be because the case law says that even seconds are sufficient to determine whether a threat is still existing. How did the district court handle those different sets of shots, so to speak? In the video, I take it you disagree with the district court's inferences from what happened the first round, but we all can see what happened there, right? I don't remember seeing the latter shots, or at least seeing Mr. Holland. Yeah, no, he wasn't in any of those videos, and that's part of the problem. We don't even have subpoena power to get the full Missouri Highway Patrol investigatory file, which might even show that he was shot in the back on some of these shots. Counsel, I was curious. The district court faulted Holland for not parsing the three volleys of shots in the complaint, but yet granted the motion to dismiss with prejudice. Shouldn't they have allowed repleting if there was a possible way to plead around what the court thought was a deficiency? I think that's an excellent point, Your Honor. Was there a re-request? The court issued its order and then issued its order to dismissal the following day, so there was no without prejudice, so here we are. But yes, I believe that's correct, and if we inartfully pleaded that volley, those extra two volleys, and combining them into one, then that can be fixed on a replete of that complaint. If there are no further questions, I'll reserve the balance of my time. Thank you.  May it please the Court. My name is Bob Plunkard, and I represent the respondents, Martin, Zimmerman, and the City of Sexton. Counsel, I heard some of the questions that just came out, and quite honestly, the first question that Judge Cross asked was going to be my first point that I stand up and say as kind of the theme, which is an individual that is behind cover for around 10 minutes, armed with a handgun, saying things like, shut up, and I'm in control, and clearly suicidal, clearly going through mental break, then removes himself from the cover with the gun to his head, and then says you have no more options, lowers the pistol, as you can see in the video and as I put screenshots in the brief, and moves his left hand towards the pistol grip. This is a menacing action, and at the very least, there is no clearly established law that it's not. Did the district court make an inappropriate inference? Your friend on the other side suggested that the district court's observation that it appeared that Mr. Holland was assuming a shooting position was inappropriate on a motion to dismiss. No, Judge Kobus, that was not inappropriate by the district court. In fact, to answer the question that you had earlier for counsel, at the Aiden case at page 959, there is the answer that this is a legal determination, not a factual dispute as to the officer's reasonableness, which we can determine from the video. So this is a matter of law before this court and properly before the district court. It's also not exactly, the question is not what the individual factually was thinking or intended. It's what the officers reasonably perceived and how they were confronted under the Graham factors in deciding to use force. Go ahead. Is this case, or at least the first volley of shots in this case, distinguishable from Mazur? It seems like maybe it's a little bit less threatening here, but similar to Mazur. It is similar to Mazur, and I do note that Judge Kobus and you, Your Honor, were both members of the panel, and that was just last year. I know in that Mazur case, the suspects, and you all know this, I'm sure, better than I do, but went to the garage where there were firearms in there, was told, was given orders and was not compliant, came out from the garage with a long arm in his right hand, and then it was pointed outward. And the district court here, as you saw, also mentioned, and as you can see from the video, when the right hand with the pistol came in an outward position, and the left hand comes, which is very critical here, when an officer is looking and a reasonable person is looking at this, it's not an effort to put the gun down, which we have a factual dispute in the Partridge cases. This is a steadying hand, which an officer could reasonably believe, you don't need this hand to put it down. We also know from the facts, he wasn't going to put it down because he didn't. He actually held onto the gun until the time that he was in the bathroom when the gun was thrown, and then the shot stopped. Well, at this point, we don't know whether the gun was thrown. You're making some inferences from areas where we can't see from the video, though, right? Like you're saying he's held onto the gun, and then he threw the gun. Maybe that's what happened, but I didn't see any video that would have shown that. So the video does not actually show, you're correct, Judge Kelly, the video does not show the gun being thrown. It doesn't show his arm going back and throwing it. What it does show is he's going into a room, and we do look at the first amended complaint for all the factual assertions. We know there's no one else in that bathroom, and there were no allegations that there was anyone else in that bathroom. There's no allegations that he tripped him. Yeah, I mean, I hear we are making inferences. I guess it's my point. We don't know what happened. Was it an involuntary reflex? Was it a tossing? I guess my point is that that seems to be an inference against the plaintiff here that isn't proper at 12B6. Well, I think it's incumbent upon the plaintiff to parse through these three different volleys and suggest something else. We know from the video it is. Well, I'm sorry, I'm just talking about you were justifying, you were saying that the shot was warranted because, oh, and we can see he wasn't going to get rid of the gun. As we know, he held onto it and threw it away. So that's where I was going with that. I see. You know, the best I can say, Judge, is we know that from the video it is, in some manner, it's being projected away on the floor. Let me ask this. You had said it's not what Mr. Holland was thinking. It's the reasonable officer's view. What do you do with all of the other factors here that really do, maybe not in huge, significant ways, but in some ways distinguish this from some of our other cases? You say, well, he said you have no other options. Well, the options were I shoot myself or you shoot me. So that's a little out of context, right? So we have about 10 or 15 minutes, which is a little unusual in these cases, to have that much time for an officer to get a sense of what's going on. Why doesn't that play into what this one movement that we've been talking about in the video really mean, and in the light of the inferences that can be made from it? Sure. And I guess the Felix case also says you don't look at the moment of the threat doctrine. And I know when this case came back on marks, this circuit said we weren't using the moment of the threat doctrine, so we're going to hold the same. And that's the point, Judge. You look at not just the things right up before, and I think that supports respondents the full way, because the video shows he's not complying. There's at least 20 commands to drop the gun. And to your point, when he says the context of you have no other options, either you kill me or I'll kill me, he knows they have arms trained at him. And he's saying one of the options is you're going to kill me. And then moving those hands isn't saying one option is I'm going to drop it like you're telling me to. One of the options is you're going to have to kill me. And he knows that. If he points this out, I think it's reasonable for an officer to believe. Do you agree with Judge Groszlow that maybe comparing this to Mazur, the overall threat level was lower because of the broader context that Judge Kelly's been describing? I think, so I could not access the video in Mazur, but from what's described as the long arm pointed outward, I don't know if the finger was on the trigger, but I just know that this was an outward. So you're not willing to concede that, I take it? I'm not willing to concede it right now. I know noncompliant, generally gun outward. And to your question earlier, you don't have to wait for the officer to point it directly at you. That's not what the menacing action is. What do we do with the multiple, sort of the three, I take it, that are three sort of sets of shots? And why did the district court's opinion on that, why is it affirmable? Well, if you remember in Partridge 1, which I'll call it, the motion to dismiss version of Partridge, the allegations were that he was complying, not pointing at the officers. But here, we don't have that dispute of fact. We don't have an allegation at parsing through each of the volleys, as the district court pointed out. Are you talking about the complaint? I'm sorry, did I? Yes. Was that argued in the motion, in opposition to the motion to dismiss? I don't believe, I don't recall I did argue that, Your Honor. Counsel, have we ever required a complaint to parse out different parts in an excessive force context? Well, it is notice pleading. I don't believe we have. Yeah, it is notice pleading, Your Honor, and I agree. However, if we're going to find something like Partridge, where there is an allegation to the contrary, and if there is some version of facts that's not apparent from the video, then it should be alleged, especially in a qualified immunity context when officers are immune from suit. Well, what about Paragraph 45? It seems to me Paragraph 45 is sufficiently broad to allege excessive force as to all shots fired, not just the first falling. Sure, and so I believe. The district court, as you know, focused on Paragraph 57G. But what about 45? For me, Judge, for qualified immunity, I don't believe that's enough. But let's assume for argument's sake that it is enough. The district court went on to say, well, it's probably they didn't go into it because he still had the gun. We know that from the video. Counsel, as you know, this court can only look at the video to the extent it blatantly contradicts the complaint. The problem that I see with this case is that the video only covers the first falling. And we've spent a lot of time talking about what that video shows. There's a good argument that it shows a menacing act. But we also know that there was a second falling, a third falling. We also know that Mr. Holland was still alive after the first falling. We have no idea what went on. How can the video blatantly contradict the complaint if there is no video? Because, as we mentioned, Felix, earlier, it's not the moment of the threat. You look at everything that went up before that. And there are a few things we do know. I guess you could call it circumstantial from the video. But we do know he has the gun still. We do know that he's disobeyed the commands to drop the gun even after he was shot. How do we know that? That he refused to drop the gun. That he still has the gun. Because in Exhibit C, towards the end, right when the shots cease on the third volley, you can see the firearm, the handgun, being thrown. You said being thrown. I see the handgun entering the frame. Maybe I'm misreading Judge Kelly's question. But it could have been a reflex where he shot, moves, and the gun slides out. Now, that's a speculation. But it's not any more speculative than your assertion that he threw it. I apologize. No, I don't mean to criticize. But that's the hard question here. What actually is shown? What is shown is the gun entering the frame in kind of a spiral-type manner. So you're saying it could have been that he refused. I'm wondering, yeah. And to me, there needs to be an allegation to that point. I mean, a complaint is to put the defendants on notice of what force is excessive and why it's excessive. And there just wasn't anything there on that. Well, but if we're on it. I mean, what information could the plaintiff have here that could go into that complaint? I mean, he doesn't have access to any of the information before discovery. I get your point. But I'm somewhat sympathetic to the plaintiff. And he may have put everything he could or everything he had into the complaint in this case. Right. And I guess this goes back to what facts do we know from the complaint and from the videos? And I submit there were many arguments that there's no blatant contradiction. The fact that it's not a menacing action, that's blatantly contradicted by the video. That the movement was slow, that's blatantly contradicted. I think that the video does fulfill those. But what we do know from the facts, Judge, is that he at least possessed that gun until that time and that he disobeyed the commands to drop it until that time. Now, whether he dropped it or it was a reflex, it wasn't alleged that way. And so there was nothing to argue about that point below, and it wasn't addressed. And it wasn't argued by plaintiff either. Paragraph 46 alleges in the complaint that Holland never threatened nor appointed the pistol at Defendant Summermundo or anyone else at any time throughout this entire period, not just the first folly. So they did allege that there was no threat. I think that's blatantly contradicted from what we see. The menacing action, to me, is absolutely a threat when your left hand also goes to the pistol grip, Judge. I think you're talking about the second and third folly. I think it at all times includes the later. So just to the point of what we just don't know. I think based on not just the moment right before of the threat, but all of the circumstances that lead up to it, that he still has the gun, is still disobeying, even after being shot. That is in itself at least a threat. It's menacing. If a person gets shot, they can drop that gun right then and say, I'm done. That did not happen. He kept that gun. So to me, that all encompasses the circumstances that we're to look at under Felix. In the broad sense, obviously, not the facts of Felix. So again, Mazur and Aiden are on point. Partridge, as I mentioned, that's heavily relied upon. It is plaintiff's burden to show that the law was clearly established. What about the, I think in Mazur there were bystanders, right? And here, I think at least at this stage, there are no bystanders. It's only law enforcement that is at issue. That's a fairly significant distinction, isn't it, between those two cases? It's certainly a factor, Judge. It's not outcome determinative or consequential. I guess to your point, you said this is decided by Mazur. And I just wonder if it is. It seems like there are some factual differences here that are meaningful in the nature of the threat that may have been at issue. There are absolutely factual differences. I think meaningful, I mean, the world of meaning, whether you mean consequential, I don't think so. But even if they were, is this the hazy border between cases? In which case, law is not clearly established and qualified immunity exists. Counsel, I wanted to ask you briefly about the wrongful death and battery counts. We haven't talked about those today. Sure. I don't think this was brief, but just very recently, last month, the Missouri Court of Appeals in McGaugh v. Naudet held that official immunity does not apply to intentional torts, including battery. Do you have any comments on that? I did see that, Judge. Well, I would say that the Eighth Circuit follows what the latest and greatest from the Missouri Supreme Court says. And have they ever directly addressed this question? I do not believe they have. So we've got no guidance from the Supreme Court, and we've got a recent decision from the Court of Appeals. Yeah. No, I think that would overturn so many Eighth Circuit cases determining official immunity in Missouri. Our job is to guess what Missouri law is, right? I do, and I don't agree with that decision, as you could imagine. I see my time has run out, but I'm happy to answer any more questions. Okay, seeing none, thank you for your time, Your Honor. Thank you. Your Honors. Partridge 1 and 2 control this issue. I believe my colleague and good friend, Mr. Plunkett, is reading Partridge 1 and 2 too narrowly by saying, you know, there was no allegation that he was moving to be in compliance with the officer's commands. What the court was really looking at is, were his actions in moving the gun away from his head, were they benign or were they malicious at that point? And if we look at it in that context, what the court said is, if the video is not conclusive on that, then that's an ambiguity, and an ambiguous question like that is for the finder of fact. That's what Partridge 1 and 2 stand for, and I believe those two cases control the outcome here because it's exactly what we have here. Was Mr. Holland's action, was it benign? As he had been doing the whole time, raising the gun to his head, put it down, and there were officers that testified at the Missouri Highway Patrol investigation. That's exactly what he did. He would put the gun up to his head, put it down. I mean, this was a 69-year-old man who was in a 15-minute standoff. You know, physically, that's probably what he's going to be doing. He can't hold it there all the time because his arm is going to get tired. He puts it down to his side, puts it back up. Again, his arm, look at that video closely, never extended ever. It was always bent. Just like even as he was falling to the ground, it was bent. And again, just to reemphasize, that's why the video does not come into play because at best that video is ambiguous. We believe it fully supports our claim, but at best it's ambiguous, and if it's ambiguous, then it does not blatantly contradict the allegations in the complaint. So if there are no further questions, thank you, Your Honors. Thank you. And thank you both for your argument here today. It's an interesting and serious case, and we'll take it under advisement.